OPINION OF THE COURT
 

 Alexander, J.
 

 The defense of mental disease or defect (Penal Law § 30.05),
 
 [1]
 
 if accepted by a jury, will absolve a defendant of all criminal
 
 *105
 
 responsibility for conduct charged in an indictment whereas the defense of extreme emotional disturbance, if accepted by a jury, will only serve to mitigate the crime of murder in the second degree (Penal Law § 125.25 [1] [a]) by reducing it to manslaughter in the first degree (Penal Law § 125.20 [2]). Because the trial court impermissibly curtailed the jury’s consideration of the insanity defense, and failed to properly instruct the jury as to the application of these discrete defenses, defendant’s conviction of manslaughter in the first degree must be reversed.
 

 As a result of a street encounter on the evening of November 10,1979, Fleeta Evans was stabbed by defendant and died from the single stab wound that pierced her heart. Just prior to the stabbing defendant had been accosted by the deceased and her friend Venus Bradford, and had been struck with an umbrella by one of them. There had been prior hostile encounters between defendant and the two women. On the fatal day, after being struck with the umbrella, defendant went home, obtained a kitchen knife and returned to the stoop of the house where Evans and Bradford were. Further words were exchanged. Bradford and Evans are said to have flailed at defendant again with the umbrella. Defendant struck out with the knife, fatally stabbing Evans.
 

 Defendant was 20 years old at the time and had a long history of mental disturbances. She was described as suffering from constant auditory hallucinations, sometimes hearing noises and other times music. She had suffered meningitis at age two, followed by epileptic seizures which resulted in mental retardation.
 

 The psychiatric evidence adduced at trial was in conflict as to whether defendant suffered from mental disease or defect sufficient to deprive her of the “substantial capacity to know or appreciate either: * * * [t]he nature and consequences of [her] conduct; * * * or [t]hat such conduct was wrong” (Penal Law § 30.05 [1]). Defendant’s expert, Dr. Ruth Finch, found her to be chronically mentally disturbed as well as mentally retarded; a chronically mentally sick person who was actually psychotic. Dr. Finch diagnosed defendant’s psychoses as “the chronic undifferentiated and paranoid types of schizophrenia”. She noted that defendant was extremely frustrated; that defendant recounted that on the day of the incident she was attacked by the deceased
 
 *106
 
 and Bradford and called names, such as “bitch” and “mental retard”; that she ignored them for a time, but they kept bothering her; that the deceased knocked her to the ground and beat her with an umbrella. Dr. Finch explained that defendant’s “whole picture is characterized by her pathology, and a person [such as defendant] who is mentally disturbed usually suffers from poor judgment, poor impulse control, poor reality. They sometimes are unable to distinguish between [the] right and wrong of the consequences of [their] acts. They don’t think things through. They are rather pre-occupied with fantasies which come through auditory and visual hallucinations * * * Mentally [defendant] wasn’t able to cope with the stresses of life. And in addition, her psychoses made her much more vulnerable to the point that * * * she ended up in a very explosive and unfortunate act, but that was her whole makeup.”
 

 Defendant also offered the expert testimony of Dr. Jay Harris, who, based upon defendant’s history and his examination, concluded that defendant did not have the ability to understand or appreciate the seriousness or consequences of her acts “due to her mental retardation and superimposed psychosis.” However, he diagnosed her psychosis as “acute” rather than chronic. He defined the condition “acutely psychotic” as involving a person’s loss of “capacity to make judgments about the effect of their actions, and abnormals of thinking, of experiencing, such as hallucinations or delusions, intrude on the world.” It was Dr. Harris’ opinion that defendant possessed an “organic form of acute psychosis” and that any “ordinary life stresses, if they become intense enough, would cause the kind of acute psychosis in a person [such as defendant] who is predisposed on account of organic brain damage”.
 

 The People’s expert, Dr. Nathaniel Lehrman, agreed that defendant was experiencing an acute psychosis at the time of the incident, an “acute psychological disorganization” caused by a “mushrooming explosiveness”. Nevertheless, he testified that in his opinion she knew the consequences of her acts at that time. Dr. Lehrman estimated defendant’s IQ to be around 70,
 
 [2]
 
 and opined that such a person would be competent to deal with the ordinary problems of life and could distinguish between right
 
 *107
 
 and wrong. Dr. Lehrman testified that he believed that “anybody could find an excuse for anything if he is under stress.” It was his opinion that a person lacks criminal responsibility when, so far as the person is concerned “he had no other choice but to do what he did.” Dr. Lehrman believed that defendant “had a choice and was, therefore criminally responsible.”
 

 The indictment charged a single count of second degree murder, that “with intent to cause the death of Fleeta Louise Evans [defendant] caused her death by stabbing her with a knife.” (Penal Law § 125.25 [1].) At the People’s request, the court agreed, additionally, to charge manslaughter in the first degree (Penal Law § 125.20).
 

 The court charged the jury as to the elements of the crime of murder in the second degree, and instructed them as to the insanity defense, charging them that “if you decide that the defendant’s guilt of the crime [of second degree murder] has been established, then consider whether her mental responsibility has been proven to your satisfaction beyond a reasonable doubt according to the definitions I have given you. If not, then your verdict should be not guilty by reason of insanity.” The court then instructed the jury in respect to the crime of manslaughter in the first degree as defined in Penal Law § 125.20 (1) and (2). In defining the elements of manslaughter in the first degree under Penal Law § 125.20 (1), the court said, with respect to intent: “Now, I just referred to intent. I’ve also instructed you as to mental defect and deficiency. If you find at the time of the incident, the defendant, because of mental condition or defect, was unable to form a judgment — of course she would not form a judgment if she’s mentally ill, and of course if you find she could not because of mental conditions, you cannot find intent. If you cannot find intent, which is one of the elements of manslaughter in the first degree, then you must acquit her of this charge.”
 

 The court failed to instruct the jury that even if they found that defendant had the requisite “intent” to inflict “serious physical injury” and thereby “caused the death” of the deceased, they should nevertheless determine whether she possessed “substantial capacity to know or appreciate either * * * [t]he nature and consequences of such conduct; or * * * [t]hat such conduct was wrong” (Penal Law § 30.05 [1]).
 

 The court next instructed the jury in respect to manslaughter involving “extreme emotional disturbance” (Penal Law § 125.20 [2]). The statutory provisions were read to them. The court then charged that “when a defendant, with intent to kill another, unlawfully causes the death of that person or another, it may
 
 *108
 
 not constitute murder when the killing is perpetrated under the influence of extreme emotional disturbance. This does not mean that the emotional disturbance exonerates the defendant or renders the killing guiltless. As long as he actually intended to cause the death of another person * * * the killing remains a crime, and remains a homicide, but is punishable as the crime of manslaughter in the first degree”. The jury was told that they should consider the testimony of “the expert witnesses, called the psychiatrists, in determining whether [defendant] was under any emotional strain or stress at the time”, and that if they found that defendant was acting under “the influence of extreme emotional disturbance” they would be justified in returning a verdict of guilty of manslaughter in the first degree under Penal Law § 125.20 (2). It was not made clear to the jury that the psychiatric testimony should also be considered with respect to the insanity defense and that such defense, if established to their satisfaction, relieved defendant of criminal responsibility for manslaughter as well.
 

 The Appellate Division, in affirming the judgment of conviction, concluded that the defense of lack of mental capacity with respect to manslaughter was adequately put before the jury and that, in any event, the issue was not preserved for appellate review because there were no objections to the charge as given nor were there further requests to charge. We disagree.
 

 Initially it should be observed that the jury was specifically instructed that if they should find defendant not guilty of murder by reason of insanity, they should acquit her of murder and then “consider whether she is guilty of the crime of manslaughter”. The impression was thus created that the insanity defense related only to the murder charge. Fairly read, the court’s instructions on mental defect or disease with respect to the crime of manslaughter under Penal Law § 125.20 (1) related only to the element of intent and not to the crime itself. Additionally, the instruction respecting extreme emotional disturbance made no reference whatsoever to the insanity defense and impermissibly restricted the jury’s consideration of the psychiatric testimony to a determination of whether or not defendant was under the “influence of an extreme emotional disturbance.”
 

 Indeed when the jury returned to the courtroom for further instructions on the definition of insanity and manslaughter, the court, after reciting the language of Penal Law § 30.05, explained it as “plain and simple language. In other words, to determine whether the person was not mentally unstable [sic]. Did she understand right from wrong? Did she know the conse
 
 *109
 
 quences of her acts, the consequences of her- conduct?” The statutory definitions of manslaughter were again read and explained as follows: “What the law says and what is here that even though she caused the death of a person, if she was emotionally disturbed to such an extent she didn’t realize what she was doing, she intended to cause injury because she didn’t realize what she was doing because of some emotional disturbance she was suffering, this is part of the mental disease on which I instructed you earlier * * * [w]here the person’s mind is unable to apprehend or does something in a fit of anger, something which would take it away from a direct intent to cause an injury.”
 

 Defense counsel’s attempt to register an objection to this supplementary charge was rejected by the court. This supplementary charge with respect to the insanity defense was patently erroneous and with respect to extreme emotional disturbance, hopelessly confusing. The court’s use of the “understand-ting] right from wrong” language inadvertently adopted the standard espoused by Dr. Lehrman which closely parallels the long-since discarded McNaghton Rule
 
 (see,
 
 Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law former § 30.05, at pp 69-70).
 

 Not only was the use of the “knowing right from wrong” standard erroneous, it contradicted the statutory provisions the court had just read and thereby must have confused the jury. “The question of defendant’s sanity at the time of the commission of the homicide * * * was the only real issue in the case and the only one on which the jury, as a practical matter, could have any serious discussion. Above all else on this record, the charge on the law concerning the subject should have been clear and unambiguous. Instead, it was contradictory and must have been perplexing and confusing to an attentive juror. Despite the fact that it was inadvertent, such a mistake in charging the law on the sole defense interposed, necessitates a reversal of the judgment of conviction.”
 
 (People v Kelly,
 
 302 NY 512, 517.)
 

 The court erroneously related the insanity defense solely to the charge of second degree murder (Penal Law § 125.25) and to the element of intent with respect to intentional manslaughter (Penal Law § 125.20 [1]). The Judge failed to make clear the jury’s obligation to determine whether or not defendant’s mental defect was such as would meet the statutory definition of insanity and thus would be “a ‘complete’ defense in the sense that it would relieve the defendant of responsibility for all [her] acts”
 
 (People v Segal,
 
 54 NY2d 58, 66), even though the jury found
 
 *110
 
 that she “intended” to inflict “serious physical harm” upon the victim and thereby caused her death (see,
 
 People v Moran,
 
 249 NY 179;
 
 People v Colavecchio,
 
 11 AD2d 161; Donnino, 1984 Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 40.15,1975-1984 Supp Pamphlet, at pp 63-66). The failure to adequately and correctly instruct the jury with respect to the scope and effect of the insanity defense deprived defendant of a fair trial and requires reversal.
 

 Because defendant was convicted of a lesser included offense, the indictment must be dismissed.
 
 (People v Beslanovics,
 
 57 NY2d 726;
 
 People v Mayo,
 
 48 NY2d 245.)
 

 Chief Judge Wachtler and Judges Jasen, Meyer, Simons and Kaye concur.
 

 Order reversed and indictment dismissed.
 

 [1]
 

 . The Laws of 1984 (ch 668, § 1) repealed Penal Law § 30.05 and reenacted the definition of the insanity defense, without substantive change, in Penal Law § 40.15, which also reconstituted the defense as an “affirmative defense”.
 

 
 *105
 
 The new enactment did not apply to any criminal action or proceeding relating to an offense committed prior to November 1, 1984, its effective date
 
 (see,
 
 Donnino, 1984 Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 40.15, 1975-1984 Supp Pamphlet, at pp 63-66).
 

 [2]
 

 . In tests administered while at Creedmor, Carolyn had scored 39 on one day and in the 80’s on another, a disparity, as explained by Dr. Finch, that could be caused by a person’s mental disease, a “pathology [that] interferes, and emotional imbalance [that] interferes with a person’s intellectual functioning”. Dr. Lehrman did not conduct any detailed tests but estimated her IQ to be “about 70 * * * maybe a little bit more”, and testified that such an IQ “would be sufficient for her to know right from wrong.”